1      UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF VIRGINIA
2                 DANVILLE DIVISION

3  **CHRISTOPHER B. JULIAN, et al.,**

4                  Plaintiffs,
                                    **No. 4:13-CV-54**
5      vs.                         Danville, Virginia
                                    **February 25, 2014**
6  **JAMES RIGNEY, et al.,**

7                  Defendants.

8          **TRANSCRIPT OF MOTIONS HEARING**
            BEFORE THE HONORABLE JACKSON L. KISER
9             UNITED STATES DISTRICT JUDGE.

10  **APPEARANCES:**

11  **For the Plaintiffs:**

12  **CHRISTOPHER B. JULIAN, Pro Se**
    **RENEE G. JULIAN, Pro Se**
13  474 Orchard View Drive
    Ararat, VA 24053
14  980-254-1295

15  **For the Defendants:**          **For the Defendant Johnson:**

16  **KARTIC PADMANABHAN**           **KATHERINE M. DeCOSTER**
    U.S. Attorneys Office          Office of the Attorney General
17  BB&T Building                  204 Abingdon Place
    301 First Street, S.W.         Abingdon, VA 24211
18  Roanoke, VA 24008              276-628-2759
    540-857-2250
19

20

21  Court Reporter:   Carol Jacobs, Official Court Reporter
                      Registered Diplomate, Realtime Reporter
22                    U.S. District Court
                      1101 Court Street
23                    Lynchburg, VA 24504
                      434-847-5722, ext. 3
24
        Proceedings recorded by mechanical stenography;
25  computer-assisted transcription.

1    (Call to Order of the Court at 10:00 a.m.)

2         THE COURT:  Good morning, folks.

3         We're here for several motions.

4         Mr. Julian, are you going to handle the argument

5    for you and your wife?

6         MR. JULIAN:  Yes, sir.

7         THE COURT:  You have to rise when you address the

8    Court, please.

9         MR. JULIAN:  Oh.  Yes, sir.

10        THE COURT:  I need to tell you, Mr. Julian, that it

11   is awful hard for a person to represent himself.  You really

12   need a lawyer.  But I understand you have got the absolute

13   right to represent yourselves if you choose to.

14        But -- having said this, I can give you some

15   leeway, but I still have to abide by the rules and the

16   statutes of the court and the government.  So I cannot

17   violate a rule, but I can certainly -- procedural-wise and

18   presentation-wise can give you some slack, but cannot break

19   the rules, even though I can bend them a little bit.

20        MR. JULIAN:  I understand, sir.

21        THE COURT:  All right.  Just have a seat.  Thank

22   you.

23        MR. JULIAN:  Thanks, sir.

24        THE COURT:  And, Mr. Padmanabhan, you have been

25   before the Court before.  And I know you, but I do not know

1    Ms. DeCoster.

2            MS. DeCOSTER:  Good morning, Your Honor.

3            THE COURT:  Ms. DeCoster, you are in the AG's

4    office?

5            MS. DeCOSTER:  I am.

6            THE COURT:  And it is the first time that I have

7    known that there was an office in Abingdon for the AG.

8            MS. DeCOSTER:  There's just the two of us,

9    actually.

10           THE COURT:  Do you handle the great southwest?

11           MS. DeCOSTER:  We do.

12           THE COURT:  Good for you.

13           All right.  I guess we need to get to business.

14   The -- I guess we'll do it by the numbers.

15           Mr. Padmanabhan, you have more people to represent,

16   so I will recognize you first.

17           MR. PADMANABHAN:  Okay.  Thank you, Your Honor.

18           Your Honor, the federal defendants, which include

19   seven individually named defendants as well as the USDA as

20   an agency, have advanced several arguments in favor of their

21   motion to dismiss and memorandum in support.

22           And to summarize, it is basically failure to state

23   a claim for multiple reasons, failure of subject matter

24   jurisdiction both in terms of *Bivens* as well as FTCA,

25   qualified immunity, sovereign immunity, and failure to

1  exhaust, which goes to subject matter jurisdiction.

2      First, in terms of *Bivens* -- and if the Court at

3  any time has -- wants to stop me because they have read the

4  briefs, that's completely fine.  And I'm happy to answer

5  questions, if that's what the Court prefers.

6      THE COURT:  Well, we have certainly gone over the

7  briefs and they are prolix, I guess I would say.  They

8  pretty well set forth your position.

9      MR. PADMANABHAN:  Yes, Your Honor.  Then I'll keep

10  -- would the Court like to hear a brief summary or --

11      THE COURT:  I'll leave that up to you.  It is your

12  case.  You argue it the way you want to.

13      MR. PADMANABHAN:  Yes, Your Honor.  Then I'll keep

14  my argument fairly brief.

15      First, in terms of -- I'll address it in terms of

16  *Bivens*, pretty much how I addressed it in the brief.  First,

17  in terms of *Bivens*, these individuals -- the federal

18  defendants in individual capacities, first off, the USDA

19  cannot be sued in a *Bivens* action.  And in terms of *Bivens*,

20  they should be dismissed out of hand.  And the case law is

21  pretty clear on that.

22      In terms of the individual defendants, the seven

23  individually named defendants, in the complaint the

24  defendant *(sic)* talks about what all the individual

25  defendants did in their roles as USDA employees.  He doesn't

1  say anything about what they did to violate his

2  constitutional rights.  He doesn't say anything about what

3  constitutional rights were violated.  And so it just doesn't

4  rise to a *Bivens*-type claim.

5          THE COURT:  Well, in trying to figure out -- and I

6  would agree that the complaint is not all that clear as to

7  what rights are being asserted, but we have divined at least

8  due process as being one of the rights asserted, both

9  substantive and procedural.

10          MR. PADMANABHAN:  Yes -- well, I think substantive

11  due process goes more towards the state defendant.  I think

12  in terms of the federal defendants he just -- just I guess

13  spells out procedural due process.  And with respect to

14  procedural due process, I think the hallmark is a right to

15  be heard.  And I think in this case he had multiple

16  opportunities to be heard.  He had the application; it was

17  denied.  It was sent to mediation; they couldn't reach an

18  agreement.  So then it went to the appeals counsel -- the

19  appeal division.  It was denied by the hearing officer,

20  Mr. King.  Then it went up to Director Mr. Klurfeld; and it

21  was denied again.  So the opportunity to be heard was

22  definitely there.

23          The second part of it is there's just no property

24  interest in this case.  He does not have a right to loan

25  proceeds such that there is in this event a due process

1    violation.

2          So I think that argument with respect to

3    Mr. Julian, the procedural due process issue is just not

4    there.

5          The defendants also -- plaintiffs also claim common

6    law conspiracy.  They claim that these seven individuals

7    acted in concert to deny him some rights.  And, again, the

8    pleadings just aren't there; the allegations just aren't

9    there to support a common law conspiracy claim under

10   Virginia law.  He hasn't been able to establish or allege

11   the required elements of a conspiracy claim.

12         The next argument, I guess, Your Honor, is

13   qualified immunity.  All of these seven defendants are

14   current USDA employees.  And they acted clearly within the

15   scope of their employment.  There has been no allegation

16   that they did something so egregious, that fell outside of

17   the outer bounds of their employment, such that there's not

18   a clearly established right that has been violated.  And so

19   they are entitled to qualified immunity.

20         With respect to sovereign immunity it seems that

21   the defendants have kind of abandoned that in the sense that

22   in his reply he said that he's just suing the individuals in

23   their official capacity for injunctive relief as opposed to

24   monetary relief.  So it seems the defendants -- the

25   plaintiffs have abandoned their claim for money damages

1   against these individuals in their official capacities.

2        With respect to the FTCA claims, I think the law is

3   pretty clear that the United States is the only proper

4   defendant.  And the seven individually named federal

5   defendants are not a proper defendant in an FTCA claim, such

6   that if this suit were to go forward, that the United States

7   should be substituted for those seven defendants and it

8   should be the Julians versus the United States.

9        But with respect to that, the Julians admit in

10  their reply brief that they didn't exhaust, they never filed

11  the administrative claim.  And their excuse is that they

12  didn't know they had to.  But that is not an excuse.  They

13  never filed an administrative claim with the agency such

14  that there was a failure to exhaust and this Court lacks

15  subject matter jurisdiction over any FTCA claim.

16       Finally, with respect to the Administrative

17  Procedures Act, the complaint was a little unclear in the

18  sense of whether they are actually seeking judicial review

19  of the merits of the underlying claim.  And the United

20  States' response to that, just in case the Court construed

21  the complaint as seeking judicial review of the underlying

22  claim and -- the law is basically that this Court has to

23  give substantial deference to the administrative agency's

24  decision, especially when it comes to administrative agency

25  regulations.

1       In this case Director Klurfeld and Hearing Officer

2   King, they followed their procedures; they followed their

3   policy, their law; and they decided that the --

4       THE COURT:  I assume the plaintiffs' main argument

5   in that sphere is that the hearing officer chose the wrong

6   version of the regulations.

7       MR. PADMANABHAN:  Well, I think the hearing officer

8   -- well, I think the agency first denied it based on the

9   fact that their loan was for -- the intent of the loan was

10   to be used for -- instead of wages, for living expenses.

11   And I think the hearing officer found that wasn't a good

12   reason to deny it, and they misapplied it.  So he didn't

13   affirm it, I guess, on that ground.

14       But he affirmed it on the fact that when you apply

15   for a loan for improvement, it has to be reasonable and

16   sufficient for your family and for your household --

17       THE COURT:  Well, that's the argument that the

18   plaintiff is making.  It should be reasonable or sufficient,

19   not "and."

20       MR. PADMANABHAN:  Right.  And I think -- and I

21   think the other -- he also makes an argument that the fact

22   that it is not on farm property makes a difference, in that

23   it is located close to farm property somehow --

24       THE COURT:  Well, that's the next, I think, maybe a

25   flaw in the plaintiffs' argument.  He says the house that is

1   in question is not even on the farm.

2           MR. PADMANABHAN:  Right.

3           THE COURT:  So how does it qualify for a farm loan?

4           MR. PADMANABHAN:  Well, and I think the regulations

5   apply to property that is either on a farm or close -- or

6   adjacent or close to a farm.  And so the regulations apply

7   to both in the same manner.  And so -- and I think that's

8   what the USDA found, that's what they applied, that's what

9   the agency applied.  And it went to the hearing officer and

10  the director of the appeals division.  And they both

11  affirmed it on that ground, that -- I mean, the house that

12  they had built was over 4,000 square feet, had multiple

13  foyers, and it was just much more than necessary for a

14  family of three, which was at the time how many people were

15  living in that residence.

16          THE COURT:  Would that be true if part of the house

17  was to be used for commercial purpose, such as a

18  wine-processing center?

19          MR. PADMANABHAN:  Right.  And I think that that's

20  what they were hoping to use at least part of their

21  residence for, as, you know, commercial.  And I think they

22  also said that they wanted to use part of their residence to

23  rent out at some points.  But I think the fact is it can't

24  be any greater than necessary to -- for a family of that

25  size.  And it was just -- USDA found it was so -- just above

1   and beyond --

2          THE COURT:  So the size of the family is the test,

3   not the use to which the property is going to be made?

4          MR. PADMANABHAN:  Well, I think the size of the

5   family is definitely a significant factor.  Now, obviously,

6   if it was a family of 10 or 15 living in that household, the

7   space necessary would be far greater than if it was a family

8   of three, for example.  So I think that's definitely an

9   important factor.

10          And like I said, Your Honor, it is not even clear

11  from their complaint if they are trying to seek judicial

12  review of the merits of that claim, but the United States

13  just interpreted it as such, actually to cover its bases, so

14  we would not proceed on that ground alone, as opposed to the

15  others.

16          And, finally, in their reply brief -- or, excuse

17  me, response brief, the plaintiffs also allege a RICO

18  violation in terms of the USDA being a

19  racketeering-influenced corrupt organization.  And the only

20  mention of RICO in the original complaint is a one-line

21  throwaway in paragraph 24 that the USDA, et al., is a

22  racketeering-influenced corrupt organization.  There's no

23  allegation other than that in the complaint.

24          Now, in the response brief, pretty much the entire

25  response brief is dedicated to alleging that the USDA is a

1   RICO-type organization.  But as argued in our reply, the

2   underlying predicates that they allege just don't apply

3   here.  They allege obstruction of justice, but the statute

4   they cite is influencing a juror or court officer.  They

5   allege mail fraud.  They allege fraud in violation of 18 USC

6   1028, but that applies to fraud in relation to

7   identification documents.  So they just don't -- they don't

8   allege the required elements necessary for a RICO violation.

9           So for any of those reasons, Your Honor, the United

10  States believes that the seven individually named defendants

11  and the USDA should be dismissed.

12          THE COURT:  All right.  Thank you, sir.

13          MR. PADMANABHAN:  Thank you, Your Honor.

14          THE COURT:  Ms. DeCoster, we'll take up

15  Ms. Johnson's motion now.

16          MS. DeCOSTER:  Your Honor, I am representing only

17  Wanda Johnson, who is the state Mediation Program Director.

18          As to Ms. Johnson, this case should be dismissed

19  for similar reasons that our codefendants have already

20  argued, for failure to state a claim and because Ms. Johnson

21  is entitled to immunity.

22          As to any due process violation --

23          THE COURT:  Well, it is somewhat amazing to me that

24  she did not know that her job or position had been

25  decertified.

1    MS. DeCOSTER:  Your Honor, while she may have made

2  a mistake, it is our argument that that doesn't create a

3  cause of action.  In particular as to --

4    THE COURT:  Well, I'm more curious as to how she

5  did not have that knowledge.

6    MS. DeCOSTER:  Well, she has her reasons as to

7  exactly what happened.  Basically it comes down to just a

8  simple mistake and oversight.  But, once again, not anything

9  that would create a cause of action.

10    As to any due process claims, we would also argue

11  that the plaintiffs had an opportunity to be heard.  They

12  did have mediation and they did have an appeal hearing.  In

13  addition, it is our argument that filing alone does not

14  confer a property interest.

15    As to -- in addition, even if there was a due

16  process claim, our argument would be that Ms. Johnson is

17  entitled to both absolute immunity and qualified immunity.

18    As to any fraud claim, we would argue, once again,

19  that no harm occurred because the Julians did receive

20  mediation and they also received an appeal hearing.  In

21  addition, the plaintiffs in no way relied on a statement by

22  Ms. Johnson that caused them harm, once again, because there

23  was no harm.

24    Finally, Your Honor, as to any conspiracy claim, we

25  would argue again that they, first of all, failed to

1 properly plead fraud, so they can't then plead conspiracy to

2 defraud.  And also we would argue that the complaint in no

3 way shows facts that suggest a concerted action.  Therefore,

4 they have utterly in their complaint failed to state any

5 claim and Ms. Johnson is entitled to both absolute immunity

6 and qualified immunity.

7          As already argued in the brief, the plaintiffs

8 brought up the RICO claim.  There's no suggestion in the

9 complaint of a RICO claim as to Wanda Johnson specifically.

10          Your Honor, for those reasons, we would argue that

11 this case should be dismissed.

12          THE COURT:  Thank you, ma'am.

13          All right, Mr. Julian, you get the chance to

14 respond to them as well as argue your partial motion -- or

15 motion for partial summary judgment.

16          MR. JULIAN:  Your Honor, are there any restrictions

17 as to what I can --

18          THE COURT:  Excuse me?

19          MR. JULIAN:  Are there any restrictions as to what

20 I can say in here or talk about, as there were in my

21 hearing?

22          THE COURT:  Well, you proceed along the way you had

23 planned.  And if you get out of bounds, I will tell you.

24          MR. JULIAN:  Okay, sir.

25          They say that it was -- that I had an opportunity

```
 1   to grieve.  And I woefully disagree with that as the, as I
 2   would say, enterprise established their own set of rules by
 3   telling me that I could not present arguments of prejudicial
 4   treatment, of negligence, of fraud.  They ruled those out.
 5   So they have intentionally attempted, from the beginning, to
 6   separate the acts of the torts from the decision on the
 7   loan.
 8            These gentlemen actually, we believe, created false
 9   documents upon our application in the very beginning and
10   sent them to us in the mail with an attempt to sabotage our
11   application.
12            THE COURT:  Why would they do that?
13            MR. JULIAN:  I don't know the answer to that, sir.
14   I would love to know the answer --
15            THE COURT:  Do you think they are just mean people?
16            MR. JULIAN:  I don't know the answer.  I can only
17   say that I have a multitude of potential reasons why they
18   would do it.  But why they did it, I don't know.
19            THE COURT:  You have run into what every citizen
20   runs into, and that's bureaucracy.
21            MR. JULIAN:  Bureaucracy.
22            Well, Your Honor, I have here that letter.
23            THE COURT:  Go ahead.
24            MR. JULIAN:  I have here the envelope that letter
25   was received in.
```

1          THE COURT:  This is not an evidentiary hearing.

2          MR. JULIAN:  I understand.  But my point is -- is

3     that if you review the document, you can see that it appears

4     to have been created or manufactured, and that it was sent

5     to me with a post date of November 9th in an envelope

6     postmarked October 22nd.

7          THE COURT:  Well, this is one of the things that

8     having a lawyer would have helped you with, because unless

9     you have submitted that as an exhibit in advance, I cannot

10    look at it.

11         MR. JULIAN:  Well, I did.  Well, Your Honor, I have

12    requested in both of my -- all of my filings the opportunity

13    to amend my pleading.  And I understand that in the -- for

14    justice, that I have that right.

15         THE COURT:  You don't have a right.  I have the

16    discretion of permitting you to do it if I think it will

17    help, but you don't have a right to amend your pleadings.

18         MR. JULIAN:  Well, the court also asked us and told

19    us in the filing of our complaint that we weren't to present

20    any statutes, any legal arguments, or present any cases as

21    evidence.  So that --

22         THE COURT:  Who told you that?

23         MR. JULIAN:  It is on your website.  It is on your

24    complaint form.

25         THE COURT:  I thought you were referring to my

1   order that was entered.

2          MR. JULIAN:  No, sir.  It is -- I actually called

3   the clerk of court and asked them to explain to me the

4   discrepancy, and the answer was yes.

5          THE COURT:  Go ahead.

6          MR. JULIAN:  It says if your complaint form is for

7   a pro se complainant, not to do that.  So it is a little

8   hard for me -- and I quoted it at the time when I called the

9   clerks -- to make this case without being able to provide

10   those specifics.

11          We did the best we could -- and the federal courts

12   for Miami, New York, and California all said that your -- a

13   pro se's complaints should be limited to 25 pages.  So we

14   did the best we could to explain everything that took place

15   and try to make our case without discussing the legal

16   aspects.

17          We believe that this letter was followed up a

18   second time with the fraudulent representations of the Code

19   of Federal Regulations.  We also believe, Your Honor, that

20   what happened was that these guys created these documents in

21   early October, which was exactly the time that Ms. Johnson's

22   certification expired, and that being sent to her for

23   mediation was the result of their negligence in creating

24   these documents, to not know that she had lost her

25   certification.

1       We know that in their rule books, in their rule

2  books, it tells them that when an individual requests

3  mediation, that those documents go to ALS, which is

4  Administrative Legal Services in the Department of

5  Justice --

6       THE COURT:  Speak to me, Mr. Julian.  You don't

7  talk to the other side.

8       MR. JULIAN:  Okay.

9       THE COURT:  Your purpose there is to address me.

10      MR. JULIAN:  Yes.

11      We believe, Your Honor -- we don't know; of course,

12  we can't prove it, but we believe that Ms. Johnson was

13  instructed not to help us.  We believe that that was an act

14  of the enterprise.

15      Ms. Johnson did not return a phone call.  She did

16  not send us a letter notifying us that she had received our

17  request.  We had return receipt from the mail, that she

18  received it on the 13th of December.  She never once sent us

19  a letter, never once called us, never once emailed or made

20  any effort to contact us whatsoever.

21      On January -- in January, when I contacted

22  Ms. Johnson on my own accord, she indicated to us that she

23  would be helping us within a matter of days.  But you have

24  to understand, Your Honor, at that point in time it was my

25  understanding that my 30 days were up, because they gave me

1    30 days from the November 28th to have mediation.

2            So I find it extremely incomprehensible that these

3    folks who were responsible, from the University of Virginia,

4    to handle mediation would not call or contact us at all,

5    make any effort to contact us or any effort to help us in

6    our request.  It leads me to believe that Ms. Johnson knew

7    the day she received our request that she wasn't eligible to

8    handle it.

9            This was followed up by our having to chase down

10   the information on the Internet as to what to do for

11   mediation.  And in those communications we were told that

12   the farm chief didn't know.

13           THE COURT:  Didn't what?

14           MR. JULIAN:  That he didn't know.  Those

15   communications were -- it was communicated to us that the

16   Virginia state farm chief was unaware that the state

17   mediation program had not handled our request and that they

18   had just lost their certification, although we -- that's

19   hearsay, Your Honor.  It came through the Internet.

20           So how do we know exactly when they knew that?

21   Because, according to the documentation, that certification

22   was lost on October 1st.  Ms. Johnson stated that she had

23   lost that certification for failure to do her paperwork or

24   to do her filings with the government.  Those filings were

25   due in August, Your Honor.

1          THE COURT:  Well, how were you injured other than

2     delayed in filing your claim?

3          MR. JULIAN:  I'm sorry, sir?

4          THE COURT:  How were you injured other than being

5     temporarily delayed in filing your claim?  You ultimately

6     took the mediation.  You ultimately availed the mediation --

7          MR. JULIAN:  Yes, sir, but that also took more than

8     two months.  That's a long time.

9          THE COURT:  So you want $14 million for that?

10         MR. JULIAN:  No, sir.  I want $14 million for this

11    RICO activity.  That's what I want the $14 million for.

12         They put me out of business.  They destroyed my

13    operation I spent seven years putting up.  And they did this

14    by creating fraudulent documentations and supporting

15    regulations through Chevron deference, trying to, as he

16    said, give them leeway in their administration.  But he

17    totally leaves out the fact that they did it all under

18    fraudulent terms.

19         Ms. Johnson did nothing to help us.  And the State

20    of Virginia did nothing to help us.  We handled our own

21    mediation processes.  And those are very stressful

22    conditions.  You do understand that in order to be eligible

23    for one of these loans you have to be in a situation where

24    you can't get credit elsewhere.  It is a requirement.

25         These gentlemen didn't follow their procedures.

They didn't do the steps that were required of them,
according to their own work manuals. And then they stepped
outside of their jobs to create fraudulent documents to take
us -- to do -- to deride our application.

And we believe that the RICO decided that they
weren't going to help us with mediation, they would try to
stop this whole thing, because they don't want to attach
those torts to that loan; no harm, no foul.

And then each of these individuals after that has
proceeded to aid and abet this operation in its ultimate
goal, which is that itself: to keep that loan from being
recognized and to keep these torts from attaching. And
there is plenty of evidence to support the fact.

I need to turn to my notes for just a second, sir.

First, he has stated that we did not have the
predicate acts. But the fact is that both of those
documents were fraudulent and put in the mail. And that
represents mail fraud.

Mr. Kraszewski proceeded in the hearing to give
testimony to the fact that he had a conversation with me
that he had never had. And that's perjury. He was sworn
in, told that he was there under penalty of perjury. The
hearing officer was a hearing officer for the National
Appeals Division and was a hearing officer of an agency of
the United States government. He made testimony to him,

false testimony.  And he -- the hearing officer asked him to
clarify it, to confirm it; and he did.  And the documents
show evidence, Your Honor, that that conversation never
occurred.

Both the hearing officer and the director, their
reviews are completely lacking in fact.  They don't address
the challenges that we made.  They hide the truth.  And the
argument that was made up here that our house is not on the
farm, well, Your Honor, they based -- the director based his
decision on that.  He based a bunch of his support on that.
And the fact is the house is on the farm.  To our knowledge,
it has always been on the farm.  And that is stated clearly
in those -- in the original briefs.  And how the director
comes to the conclusion and makes the argument that the
house isn't on the farm is beyond me.  That is covered in
the original complaint.

The other thing that is not -- the hearing officer,
in the prehearing, he ruled out our opportunity to discuss
the fact that there were items on there that were completely
incompetent and false.

And the hearing officer, he actually read to us
during that time period one of the regulations.  I don't
have it before me.  But that regulation was that the act
that causes us to breach the rule, he ruled that that rule
would be applied as it was written at the time of our

1    application.  But the item that actually broke that rule was

2    the design of the house.  And the design of the house

3    happened eight years prior.  But the rule says that it is

4    supposed to be applied as it did at -- at the time --

5            THE COURT:  What if the house had been designed in

6    1889?

7            MR. JULIAN:  Sir?

8            THE COURT:  Which rule would apply then?

9            MR. JULIAN:  Well -- if the house had been built in

10   1899, which rule would apply?

11           THE COURT:  Yeah.  If that's your theory, is that

12   the rule -- when you designed the house, was it in 2008?

13           MR. JULIAN:  Yes, sir.  I wasn't even seeking a

14   loan at that time.

15           THE COURT:  Well, what I'm saying, a hypothetical,

16   Mr. Julian, to follow your theory, if the house had been

17   built in 1899, you would have to apply whatever rule was in

18   effect at that time.

19           MR. JULIAN:  If that was the case, Your Honor, I

20   would be asking to purchase a house, not to build one.  And

21   I didn't even ask to do that.

22           THE COURT:  Well, it seems to me that's a rather

23   frivolous argument to say that when the house was designed

24   is when the rule should be applied.

25           MR. JULIAN:  Well, Your Honor, they changed the

```
 1   rule.
 2             THE COURT:  Oh, they did.  No question about that.
 3             MR. JULIAN:  They changed it and they made it
 4   incomprehensible.  And not only is it incomprehensible, but
 5   the other pieces of that rule -- first off, we would argue
 6   that that rule is not applicable at all to our case.  If you
 7   look at the document in terms of -- if you look at those
 8   rules, the way they are written, in terms of reading them on
 9   the four-corner basis -- I have been an accountant and a
10   programmer for 20 years.  I spent my entire life doing
11   financial analysis.
12             THE COURT:  What is your view of the Tax Code?
13             MR. JULIAN:  What is my view of the Tax Code?
14             THE COURT:  Yeah.  Do you think it is written
15   right?
16             MR. JULIAN:  I think it ought to be simple,
17   simplified, extremely.
18             THE COURT:  Go ahead.
19             MR. JULIAN:  That's okay.
20             Your Honor, this is an attempt by this organization
21   to manifest an enormous fraudulent scheme.  It is their
22   desire to separate those loan proceeds from the torts that
23   occurred.  And they did that when they separated out the
24   items on the declination letter that were completely bogus.
25   They did that when they took out the argument that negligent
```

1   -- as if negligence, fraud, and prejudicial treatment had

2   nothing to do with the decision.  How can you -- that's

3   like, you know, the drunk color-blind man going through the

4   red light, kills somebody, and the only thing that is

5   accountable is that he went through the light.  And the

6   judge gives him deference because he's color-blind.

7           And each of these individuals, Wanda Johnson, the

8   -- when we requested information -- in fact, we requested

9   information specifically to try and identify proof, to do

10   discovery, Your Honor, from our -- what do you call it when

11   you request information from them?

12           THE COURT:  Are you talking about discovery

13   procedures?

14           MR. JULIAN:  No, it wasn't discovery.  It was

15   Freedom of Information Act requests.  When we made those

16   requests, we asked for information that would prove our

17   points.  And they came back with information, but they never

18   provided what we asked for.  And we reserved the right to go

19   to discovery to find these items.  And we're more than

20   willing to update our complaint.

21           THE COURT:  All right, sir.  Thank you, Mr. Julian.

22           MR. JULIAN:  On the motion, Your Honor, to -- that

23   I have --

24           THE COURT:  Your motion, go ahead and address it.

25           MR. JULIAN:  Yes, sir.  I understood that to be a

point of law, Your Honor, that contracts require that you

have an agreement, that you have an understanding, that

there is a compensation.  There was no compensation.  We ask

the Court that that agreement be null and void.  They don't

have the capability to enter into that agreement.  They

can't abrogate their own immunity.  And they have certainly

requested it.

THE COURT:  All right, sir.

MR. JULIAN:  As to being allowed to have sovereign

immunity, these gentlemen stepped outside their roles.

Ms. Johnson stepped outside of her job.  They did not do

their jobs.  And we're more than happy to present all of the

evidence to that fact.

As to judicial review, we did request judicial

review in that.  And we don't know what the -- how the Court

views that request, because we do understand there's

restraints in judicial review.  But we prefer to have a jury

decide whether that was actually a valid request or not,

whether they actually misread those rules, because you have

given Chevron deference to these -- to this gentleman back

here to interpret that rule.  And the hearing officers are

told in their own handbooks that they are not to question

your decisions.  So you have given Chevron deference to

these guys who started out with a fraudulent, negligent,

prejudicial attempt to deny --

1          THE COURT:  Mr. Julian, you are repeating yourself.

2    If you have got something new to say, I'll hear it.  But

3    let's not go over old ground.

4          MR. JULIAN:  So could the Court clarify for me

5    whether perjury counts as obstruction of justice?

6          THE COURT:  No, I'm not your lawyer.

7          MR. JULIAN:  Okay.  Well, as far as we're

8    concerned, there's predicate acts.  There are two specific

9    examples of mail fraud; that Mr. Kraszewski did, in fact,

10   commit perjury, and we consider that obstruction of justice.

11   And we would argue, sir, that an entity and a government

12   agency regularly identifies itself with written documents,

13   that they recognize themselves as -- present themselves

14   based on regulations, and that these guys sent to us a

15   fraudulent document with the agency's letterhead on it and

16   that inside that document they used false representations of

17   the Code of Federal Regulations as authentication features

18   of that document.  And those features were fraudulent.

19          It is my understanding, Your Honor, that any time

20   that they have committed a crime, they have violated my due

21   process rights.  It is also my understanding that Congress

22   granted me the liberty to apply for these loans, provided

23   that I had met the requirements, and that we met the

24   requirements in every aspect, with the exception of this

25   argument about our house.  But we didn't ask them to build

us a house.  And we don't believe that rule applies to

making improvements to a house, particularly when -- if you

look at the other facts as to what drove us to this point,

to make this loan application.

THE COURT:  All right.  Thank you.

You can have a seat, Mr. Julian.

You get the last word.

MR. PADMANABHAN:  Yes, Your Honor, just briefly.

Thank you.

First with respect to the motion for partial

summary judgment, the summary judgment with respect to

paragraph 11 of the complaint, and he's asking you to find

that the two individuals at the USDA lacked the capacity to

enter into that contract.  That's necessarily a material

issue -- a genuine issue of material fact.  It cannot be

decided on summary judgment.  And that's not even

withstanding the fact that we argue that this court lacks

subject matter jurisdiction to even entertain the motion for

summary judgment.  And if the Court finds that there's no

subject matter jurisdiction, then it cannot rule on the

motion for summary judgment.  But, like I said, even if

there were subject matter jurisdiction, this is not an

appropriate issue for summary judgment because it

necessarily implicates a factual issue.

The plaintiffs also allege in their motion

fraudulent inducement. But in their reply to our memo in
opposition they essentially abandon that claim altogether
saying aside from -- aside from fraudulent inducement,
essentially abandoning that theory altogether. So I think
for those reasons summary judgment is inappropriate in this
case.

With respect to plaintiffs' arguments in opposition
to our motion to dismiss, I would say that plaintiffs again
have just made conclusory allegations about fraud and what
all of these people did in violation of the law. I mean,
one thing to note is he states that violations are not --
violations of law necessarily give rise to a claim, but
qualified immunity does not -- that's not true. Just
because an individual may violate the law does not
necessarily mean he's not entitled to qualified immunity if
he's performing his job as he sees fit.

And the plaintiffs also go to great lengths to
allege negligence. But even assuming the seven individually
named plaintiffs were negligent, that doesn't rise to a
constitutional violation. Of course, we don't concede that
they were negligent. But even assuming that was the case,
there's still no *Bivens* cause of action, there's no cause of
action in the Federal Tort Claims Act, there's no cause of
action for negligence against these federal employees.

And, finally, in terms of RICO, again he just

```
 1   alleges a RICO-type organization without any specificity as
 2   to how the USDA or these seven individuals are a RICO-type
 3   enterprise.  I mean, what did they do to be a RICO
 4   organization?  I mean, using his logic, there must be
 5   thousands and thousands of people that the USDA fraudulently
 6   denies loan applications to every year.  And there's no
 7   evidence to support that fact.  Plaintiff just makes
 8   conclusory allegations that the USDA and these seven
 9   individuals are a RICO-type organization.
10        And in terms of the predicate offenses, like I said
11   in the brief, they just don't apply.  The cases, the
12   statutes he cites just don't apply in this case.
13        If there's nothing further, Your Honor --
14        THE COURT:  Thank you.
15        MR. PADMANABHAN:  -- thank you, Your Honor.
16        THE COURT:  All right.  For Ms. Johnson?
17        MS. DeCOSTER:  Your Honor, my client isn't involved
18   in the summary judgment motion.  And unless you have any
19   questions, I have nothing to add to my argument.
20        THE COURT:  No further questions.
21        All right.  We'll give you a decision in writing.
22   We'll try to sort this thing out.
23        Let's adjourn.
24        (Thereupon, at 10:40 a.m., these proceedings were
25   adjourned.)
```

1     I certify that the foregoing is a correct transcript

2 from the record of proceedings in the above-entitled matter.

3

      _____/s/ Carol Jacobs_____              March 25, 2014
4     Official Court Reporter                      Date

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25