UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

DANVILLE DIVISION


```
* * * * * * * * * * * * * * * *
CHRISTOPHER B. JULIAN, et al.,* CIVIL ACTION 4:13-CV-00054
                              * AUGUST 7, 2014   2:58 P.M.
              Plaintiffs,     * MOTION HEARING
                              * VOLUME I OF I
vs.                           *
                              *
JAMES RIGNEY, et al.,         * Before:
                              * HONORABLE JACKSON L. KISER
            Defendants.       * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiffs:       CHRISTOPHER B. JULIAN, PRO SE
                          RENEE G. JULIAN, PRO SE
                          474 Orchard View Drive
                          Ararat, VA 24053


For the Defendants:       KARTIC PADMANABHAN, ESQUIRE
                          United States Attorney's Office
                          BB&T Building
                          310 First Street, S.W., Room 906
                          Roanoke, VA 24008


For Defendant Johnson:    KATHERINE MICHELLE DeCOSTER, ESQUIRE
                          Office of the Attorney General
                          204 Abingdon Place
                          Abingdon, VA 24211




Court Reporter:           Judy K. Webb, RPR
                          210 Franklin Road, S.W., Room 540
                          Roanoke, Virginia 24011
                          (540)857-5100 Ext. 5333


        Proceedings recorded by mechanical stenography,
transcript produced by computer.

1     (Court convened at 2:58 P.M.)

2         THE COURT:  Good afternoon, folks.  We have three

3   matters to take up this afternoon.  There is a motion for

4   sanctions by the plaintiff as to Ms. DeCoster, the Court's

5   show cause order, and the Department of Agriculture's motion

6   for summary judgment.

7         The first two matters are interrelated, and I'll take

8   them up first.  So the motion for sanctions, Mr. Julian or

9   Ms. Julian, whoever is going to argue it, I'll hear you now on

10  that.

11        MR. JULIAN:  It was very simple, Judge.  The rules

12  state that she needs to effect service.  She failed to effect

13  service.  You left us in a position to make arguments with the

14  court, having not been served those papers, and you approved

15  her motion to -- for an extension of time without that paper

16  ever being served.  And then you put us in a position where we

17  could not argue without jeopardizing our case that those --

18  the other side of that argument.  We couldn't -- we couldn't

19  jeopardize our case if we had responded with the request that

20  her failure to effect service allowed us default judgment.

21        THE COURT:  All right, sir.  Anything further?

22        MR. JULIAN:  No, sir.

23        THE COURT:  All right.

24        MR. JULIAN:  Yes.  Actually, I do have one thing

25  further.

1          THE COURT:  All right, sir.

2          MR. JULIAN:  Ms. DeCoster is the only one that I see

3     who has represented herself appropriately.

4          THE COURT:  Ms. DeCoster.

5          MS. DeCOSTER:  May it please the Court, I would like

6     to begin by stating that I am aware that plaintiffs should

7     have been served in accordance with Rule 5.  It was an

8     oversight on my part, but it is our position that it is a

9     legally excusable oversight.

10          Many courts have excused noncompliance with Rule 5

11     for good cause.  There are multiple factors that these Court's

12     have looked at; two of the factors, actual notice and implied

13     consent, when by themselves, have been determined not

14     sufficient for excusal.  However, we have both actual notice,

15     implied consent, and additional factors, and we believe that

16     when considering all of those factors together, it makes this

17     noncompliance excusable.

18          The first factor, Your Honor, is implied consent.

19     Plaintiffs initiated e-mail contact.  They e-mailed me

20     regarding the filings, so I responded by e-mail, attached the

21     filings.  Plaintiff replied via e-mail to confirm receipt

22     without objection.

23          The second factor we have is actual notice.  As I

24     stated, plaintiffs did respond via e-mail, confirming receipt

25     of the documents, and plaintiffs filed a response to the

1 | motion.

2 |       The third factor we have is that plaintiffs filed a

3 | timely response; thus, similar to the *Amenia* case, they were

4 | not prejudiced by service.

5 |       The fourth factor is that plaintiffs failed to object

6 | in their response or at the hearing. They did not file a

7 | motion for reconsideration, they did not file a motion to

8 | alter or amend; thus, it is our position that, similar to the

9 | *Switzer* case, they waived this objection.

10 |       The fifth factor is that plaintiffs did in fact

11 | receive proper service on our reply brief as to the motion to

12 | dismiss. In the reply brief, we also moved for dismissal.

13 |       Finally, Your Honor, I would like to point out that

14 | this mistake was not made in bad faith. It was made in an

15 | attempt to get the documents to plaintiffs as quickly as

16 | possible.

17 |       Under these factors, it is our argument that the

18 | Court should find good cause and excuse any noncompliance with

19 | Rule 5.

20 |       In addition, Your Honor, the plaintiffs mentioned

21 | Rule 11 sanctions; however, plaintiffs failed to complied with

22 | the safe harbor provision. They failed to comply because they

23 | failed to serve the motion 21 days prior to filing, and the

24 | motions were filed after the dismissal of our client.

25 |       In conclusion, Your Honor, we would ask that these

1  motions be denied.

2          THE COURT:  Thank you.

3          You get the last word, Mr. Julian, if you care to.

4          MR. JULIAN:  Yes, sir, I do.

5          She stated that we had -- we responded in a timely

6  manner.  The only reason we responded was because we received

7  a Jonesboro [sic] notice from this Court.

8          THE COURT:  That's the *Roseboro* notice, not the

9  Jonesboro notice.

10          MR. JULIAN:  Sir?

11          THE COURT:  *Roseboro*, not Jonesboro.

12          MR. JULIAN:  Yes, sir.  Yeah, *Roseboro*.  Okay.

13  *Roseboro*.  We received a *Roseboro* notice.

14          THE COURT:  That's fine.  Courts enter that --

15          MR. JULIAN:  That's the only way we would have ever

16  replied to this, because had we not received that, we would

17  not have known about it at all, period.

18          THE COURT:  But the fact is you did, and you

19  responded.

20          MR. JULIAN:  Yes, sir.

21          THE COURT:  In --

22          MR. JULIAN:  Also, the fact is the rules state that

23  we have to agree to electronically be served.  We never did.

24  The rule says that we have to grant that permission

25  specifically, and we did not.

1              THE COURT:  All right.  Thank you, sir.

2              Well, to cut to the bottom line, first of all,

3    Rule 11 is not a proper vehicle on which to challenge a faulty

4    service of process.  Rule 11 is designed to discourage and

5    prevent intentional misconduct, not negligent acts on the part

6    of opposing counsel.

7              I accept Ms. DeCoster's explanation as to why service

8    was not made appropriately; I find that it was not.  However,

9    I also find that the lack of proper service was in no way

10   prejudicial to the plaintiffs.  They responded in a timely

11   fashion and their response was considered.  So I overrule that

12   motion.

13             Now the more serious thing, Mr. Julian, is your and

14   your wife's response to the brief that the defendant filed in

15   opposition to your motion.  I think you designated that as a

16   Reply to Response to Motion for Sanctions.

17             That is the jumping-off point for Court's order to

18   show cause, and we're here now to hear any statement or any

19   evidence or any way you care to try to show cause for some

20   very serious conduct.  I think the conduct is outlined in the

21   order to show cause.

22             MR. JULIAN:  Am I here to speak?

23             THE COURT:  Sir?

24             MR. JULIAN:  Am I here to speak now?

25             THE COURT:  Yes.

1          MR. JULIAN:  Is it my turn?

2          THE COURT:  It's your turn.

3          MR. JULIAN:  You say -- first off, let's look at

4   this -- I want to look at this piece that -- your order to

5   show cause.  It says:  "On June 6th, plaintiffs Christopher

6   and Renee Julian filed their Reply to Response for Motions

7   [ECF No. 60].  In the filing, they made several scurrilously

8   [*sic*] and wholly unsubstantiated allegations about this Court,

9   including accusing the Court of intentionally waiting to set

10  Defendants' Motion to Dismiss for hearing."

11         That's actually not accurate, sir.  If you go back

12  and read the statement, that's not what it says.  I did not

13  accuse you of that.  It said that it was interesting to note

14  that --

15         THE COURT:  Well, it could be read --

16         MR. JULIAN:  -- that there was no hearing made, and

17  that Ms. DeCoster never requested one, nor did the Court

18  schedule one.

19         You left us hanging out there for three months, and

20  then who scheduled the hearing?  Not Ms. DeCoster.  According

21  to your local rules, it was her job to require it, and yet you

22  scheduled the hearing.

23         And that statement is false.  I didn't make that

24  allegation, but you wrote it in this paper.

25         Next, the Court -- "Moreover, plaintiffs accuse

1  me" -- I assume that means you?

2          THE COURT:  Yes.

3          MR. JULIAN:  -- "of being a criminal, and accuse the

4  Court of corruption."

5          Would you like to read this statement for us, or

6  would you like me to read it aloud?

7          THE COURT:  I think it's there, you can read it if

8  you choose to.

9          MR. JULIAN:  I would like to, yes, sir.

10         It says:  "A corrupt federal agency aided and abetted

11 by a corrupt federal court is a travesty of justice for

12 American democracy, an insult to the U.S. judicial system, to

13 the Constitution of the United States of America, and to life,

14 liberty, and justice for all.  It results in tyranny,

15 oppression, and absolute despotism of the people, justifying

16 completely and succinctly the Second Amendment to the

17 Constitution of the United States.  And there is no greater

18 criminal than the criminal that sits on the bench, robbing

19 America of its foundations."

20         Excuse me, sir.  Did you hear your name in there?

21         THE COURT:  No, Mr. Julian.

22         MR. JULIAN:  Did you hear me mention this Court in

23 there?

24         THE COURT:  No.  You're in this court, and that's

25 what you're saying.  It doesn't take a rocket scientist to

1  figure out what you're referring to, Mr. Julian.

2          MR. JULIAN:  Well, what you're saying is, is that

3  you're making an assumption.  I thought the Court was based on

4  facts.

5          THE COURT:  Go ahead, Mr. Julian, finish your

6  statement.  It's about as frivolous as your filings are.  Go

7  ahead.

8          MR. JULIAN:  I didn't -- you accused me of vilifying

9  this Court, but this Court has written a memorandum with lies,

10 deceit, deception, intentional misrepresentation, and that's

11 not how I expect to see the scales of justice balanced.  I

12 don't appreciate --

13         THE COURT:  You're getting close to being in contempt

14 of court here, Mr. Julian.

15         MR. JULIAN:  You want me to tell the truth, the whole

16 truth and nothing but the truth, or do you want me to stand up

17 here and cower down?

18         THE COURT:  If you've got any justification other

19 than your interpretation of these words, I'll be glad to hear

20 it.

21         MR. JULIAN:  I gave you plenty of examples in my

22 documentation of actual ignoring facts.  They are well

23 documented on the blog that you decided to read the day before

24 my appeal hit the appellate court.

25         THE COURT:  Go ahead.

         MR. JULIAN:  Those documents, they show facts, they

show the truth.  So if you want to have a jury and we'll talk

about them all in front of a jury, then fine.

         You note down here that in the pretrial order filed

in this case, the parties were instructed that it is their

responsibility to set the motions for hearing.  Not mine,

Ms. DeCoster's.  I wasn't the movant.

         There are numerous statements within this order

itself that are factually incorrect, and I expect facts and

the truth throughout my case.  And it is my civic duty -- as

this entire suit is about accountability and responsibility

for the criminal acts of these individuals, it is my civic

duty -- and you are a civil servant as well -- to hold these

people accountable and responsible for their actions.  And

that's all we're seeking to do, and to get the truth out,

because nobody seems to want to hear the truth.

         That's all.  My wife has nothing to do with any of

this.

         THE COURT:  For the record, we will file -- we have

pulled from the Internet the postings that the plaintiffs have

made, and these postings will be filed in the record for

whoever wants to determine what they say.  It will be there

available.

         But I find, Mr. Julian, you have violated -- I could

find you in contempt of court and impose more serious

sanctions than I have.  But you and your wife signed off on
this rather flaming reply and your response -- I think both
you and your wife signed it -- and therefore come under the
parameters of Rule 11.  Signed by Christopher Julian and Renee
Julian, so the sanctions will have to be as to both of you.

I find that they're false accusations of criminal
misconduct and ethical misconduct, and the Court will not
tolerate that type of activity.

I will impose a monetary sanction because I think
maybe a more severe sanction would be inappropriate, and I
hope that the sanction that I will impose under Rule 11 rather
than under the Court's contempt powers will be sufficient to
deter any future conduct on the part of the plaintiffs.

Accordingly, I will assess a $500 sanction against
you, both of you, jointly and severally, and there will be a
written order to this effect.

Do you have any question -- do you want to see the
papers that we pulled off of the Internet, Mr. Julian?

MR. JULIAN:  No, sir.

THE COURT:  All right.  They will be filed.

All right.  That brings us to the Department of
Agriculture's motion for summary judgment.

Mr. Padmanabhan.

MR. PADMANABHAN:  Thank you, Your Honor.

Your Honor, the only issue left in this case is the

1   Court's review of the final agency decision of the USDA.  That

2   makes this issue especially appropriate for summary judgment,

3   as the factual record in this case is closed.  The Court has

4   before it the administrative record.

5           In addition, the Court's review in a case under the

6   APA is very limited and affords great deference to the agency

7   decision, and this is especially true when it's an agency

8   interpretation of their own regulation.  And this Court should

9   only overrule such an interpretation when it's plainly

10  erroneous.

11          In addition, Your Honor, there's a presumption that

12  the agency decision is fair and correct, and it's the

13  plaintiffs' burden to overcome that presumption, and the

14  plaintiffs have not done that in this case.

15          First, as stated in the brief, Your Honor, the agency

16  concedes that Director Klurfeld's decision is the final agency

17  decision that is reviewable by this Court.

18          Now, turning to Director Klurfeld's actual decision,

19  the Consolidated Farm and Rural Development Act implemented

20  the Farm Ownership Loan Program, which is what's at issue

21  here.

22          The act provides for -- provides for loans for making

23  capital improvements but does not define that term.  In

24  addition, the implementing regulations also provides for loans

25  for making capital improvements, but similarly does not define

1  that term.

2      The agency filled in the gap by devising a handbook

3  to provide guidance to loan applicants.  In that guidebook, it

4  says that the loans must -- any residence or any building must

5  adequately meet family needs and be modest in size, cost, and

6  design.

7      THE COURT:  Is there any issue about, whether you

8  adopt the handbook's version or the IRS's version, any real

9  dispute about what capital improvement is?

10     MR. PADMANABHAN:  I don't think so, Your Honor.  I

11 think this handbook was just providing guidance, more specific

12 guidance to loan applicants as to what they need to do to

13 qualify for these loans.  And it provided that, like I said,

14 they need to be modest in size, cost, and design, and

15 adequately meet a family's needs.  Both requirements are

16 required.  And this applies to new construction as well as

17 improvements to existing buildings.

18     And the only distinction here really between farms

19 located -- or property located on a farm versus off a farm or

20 near a farm is the way in which the loan proceeds are to be

21 used.

22     THE COURT:  Well, isn't the plaintiff's house located

23 on the farm he was applying under?

24     MR. PADMANABHAN:  Yes, it is, Your Honor.  And like I

25 said, there's no distinction between being off a farm and on a

farm in terms of the modesty in cost, size, and design.  It's
only that if it's off a farm, it can be used to improve it; if
it's on a farm, it can be for new construction as long as it's
for a farming purpose.  And the agency interpreted that
regulation and said that the requirement of it being modest in
size applies to all structures, whether it be on a farm or off
a farm.

        And under *Chevron*, under *Chevron* deference, first
under step one, Congress didn't explicitly state -- or didn't
explicitly address the issue directly, so it's left to agency
interpretation under *Chevron* step two.  And like I said, the
handbook says exactly what needs to be done for existing and
new construction.

        And throughout the process, the Julians did not
dispute that their proposed building is not modest in size,
cost, and design.  In fact, they spent over $600,000 of their
own money in attempting to create their dream house.  And the
legislative intent in passing these laws was for the
underprivileged farmer or the small farm owner or operator,
not a case such as the Julians.

        In addition, the house they propose to build is over
4600 square feet, has a two-car garage, a rec room, fitness
area, second master suite, winery, two foyers, a deck, a
screened porch, and a morning porch.  One could hardly say
that for a family of three that that's modest in size, cost,

1   or design.

2          Therefore, Your Honor, we believe that the agency

3   interpretation was correct and was supported by ample evidence

4   such that their decision cannot be viewed as arbitrary,

5   capricious, or not in accordance with the law.

6          Thank you, Your Honor.

7          THE COURT:  Mr. Julian, your response?

8          MR. JULIAN:  Mostly fallacy.

9          THE COURT:  Sir?

10         MR. JULIAN:  Mostly, it's a fallacy, Your Honor.

11         THE COURT:  What's a fallacy?

12         MR. JULIAN:  Those statements, because, first off,

13  these gentlemen never asked us a single question, not one.

14  They're required to, by their rule books, to ask us questions.

15         THE COURT:  Are you talking about the present

16  counsel?

17         MR. JULIAN:  No, sir.  I'm talking about the USDA.

18         THE COURT:  Oh.  All right.

19         MR. JULIAN:  These gentlemen and their so-called

20  handbook that they're relying on requires them to ask us

21  questions.  They skipped all those procedures.  They never

22  asked a single question, number one.

23         Number two, they didn't --

24         THE COURT:  By law, didn't you go through the three

25  levels of hearings?

1          MR. JULIAN:  Yes, sir.

2          THE COURT:  And did you show up?

3          MR. JULIAN:  Yes, sir.

4          THE COURT:  Did you make statements?

5          MR. JULIAN:  Yes, sir.

6          THE COURT:  Did they not ask questions during that?

7          MR. JULIAN:  That's not the point, sir.  They're

8    supposed to ask questions before they ever deny the loan; it's

9    a requirement.  They have required procedures in their

10   handbook they skipped entirely.  You have denied us the

11   opportunity to produce that evidence both in all of the

12   administrative hearings and now in this court.

13         They altered the rule after the fact that we had --

14   after we had already started the house.  And it's a

15   requirement of their rule book, it's required by the appeals

16   division that they look at when the rule was changed and when

17   the act occurred that broke that rule.

18         THE COURT:  That was argued before the appellate

19   court, and they turned you down, Mr. Julian.

20         MR. JULIAN:  I have not heard anything from the

21   appellate court.

22         THE COURT:  Or maybe it was the ultimate -- the last

23   hearing officer.  That point was made by you before the

24   tribunal, and it was rejected.

25         MR. JULIAN:  No, sir.  No, sir, it was not.  That's

not true.  We've never been allowed to present this evidence
to any court or to any hearing.

You can't alter the rule after the fact has already
occurred.  Are you going to apply the laws to me today because
I broke them a month ago and it just was put in place today?
Is that what you're going to do?  Are you going to make me
responsible for a law I broke three months ago because you
passed a law today to say it's illegal?  That's what you're
asking with this house.

You put me in a situation and say the house is more
than meets my family needs, but that didn't exist when I
started.  Not only that, but this whole thing about the house
is just utterly ridiculous, because their rules require them
to ask me -- to work with me if there's another way for us to
be eligible for those loan proceeds.

We owned everything: farm, equipment, land,
everything.  It was absolutely -- there was a hundred ways to
request that application without ever involving the house, and
they know that.

You go back and listen to the hearing tapes, they
mentioned -- how many times did they walk up and say simply,
"If you just come back and ask for labor instead of living
expenses, we can work it out."  It's documented in the
administrative record.

We didn't come ask for a farm loan to build a house,

we never asked for that.  And I've got a question for you:  If
I wanted a farm loan just to build my house, this "super
house" they're calling it, that was actually designed for my
wife and I to live on the first floor, and my mother to come
live with us, who is now 90 and struggling, who has nobody
living in her house, nobody taking care of her, no money, and
the government just about destroyed everything she had, if we
wanted money for a house, then you tell me why I went to them
in 2009, as documented in the administrative record, looking
for a farm loan when I had a half a million dollars in cash,
$300,000 worth of real estate paid off, and a $250,000
mortgage lined up?  Why was I looking for a farm loan?  To
start a vineyard.

        I wasn't eligible for a farm loan then.  They
required three years of farm experience.  How was I supposed
to get it?

        And then you alter the rule on me after I've already
started, and then you want to apply that to me and not even
give me an opportunity to argue that my house meets my needs.
You totally blocked me from that argument completely by that
decision.  That's not due process.  That's a violation of due
process.

        They're not entitled to *Chevron* deference, because
this gentleman back here doesn't know what he's doing.  And
that's what this group has given you.  They're granting these

guys *Chevron* deference in interpretation of a rule that is
factually broken. It's actually incomprehensible because they
changed it.

And it's not a statute, it's a guideline in their
handbook. The statute mentions nothing on the size of a -- on
the size of a house, nothing, no restrictions whatsoever on
the use of capital improvements. And the fact that Congress
didn't tell them what a capital improvement was has nothing to
do with defining what capital improvements are. That's
understood worldwide. When you set limits, they're setting a
limitation on a capital improvement, they're not defining what
it is.

They're not entitled to *Chevron* deference when
they're talking about a rule that they've changed and they've
given no intermediary time for people who are already in
process to adjust to the changes in their rules.

But all that makes nothing to the fact that there
were a hundred ways to request that application without ever
involving the house whatsoever. 20 acres is not a large farm.
And the beginning farmer loan program was established
additionally and has special treatments specifically to get
people involved again in farming. It is designed to help
people reach commercial viability.

We spent five years and our money struggling to bring
that place back up. And I've got a question for everybody in

this room:  How many of you have ever gotten out and trenched

with a shovel a 5,000-square-foot house?  How many of you have

formed concrete with your own two hands?

        THE COURT:  You're getting off point, Mr. Julian.

        MR. JULIAN:  No, I'm not.  I built this house with my

own two hands from the ground up.

        THE COURT:  If I tell you you're getting out of

order, you're getting out of order.  Don't argue with me.

        MR. JULIAN:  Okay.  Fine.

        But I built that place with my own two hands, and two

farmhands, who I was giving employment to.  Rural development

is about creating new business in small rural developments and

providing jobs.  And you afford a *Chevron* deference to these

gentlemen who didn't know how to do their job, hadn't been

trained to do their job, took to executing fraud to avoid

doing their job, and then they went out, created fraud to

avoid the fact that they hadn't done their job.

        THE COURT:  I don't know about the --

        MR. JULIAN:  And then they committed perjury to cover

it all.

        THE COURT:  There you go again, charging people with

crimes you have absolutely no proof of.

        MR. JULIAN:  I do have absolute proof of.

        THE COURT:  You may have to defend --

        MR. JULIAN:  I gave you the proof.  I gave you

1  100 percent proof.

2          THE COURT:  Mr. Julian, shut up.  You're charging

3  these people with criminal conduct, and that's what you were

4  here on the show cause for.  Why they haven't brought a libel

5  action against you, I don't know, but certainly they have very

6  good grounds to do it.

7          MR. JULIAN:  Sir, I gave this Court a hearing tape

8  and the evidence that proves those allegations, and I gave you

9  details outlining exactly where on those tapes that occurred.

10  And there's -- we didn't even bring up all of them.  There's

11  multiple more.  I'm happy to prove them in a court of law.

12  That's what I asked for to start with.  Let me put it in front

13  of a jury.

14          THE COURT:  Response, Mr. Padmanabhan?

15          MR. PADMANABHAN:  Briefly, Your Honor.

16          MR. JULIAN:  Oh, one more thing.  I had one more

17  comment, I want to make sure it gets out here.

18          You talk about the director reviewed this

19  information.  He can't actually review what they said.  He has

20  to accept their interpretation.  That's in his rule book.

21          THE COURT:  Who does?

22          MR. JULIAN:  The director.

23          THE COURT:  The lawyer?

24          MR. JULIAN:  The director and the hearing officer

25  have to accept whatever these gentlemen determine, even if

1   they've never been trained on it.

2        THE COURT:  All right, sir.

3        MR. PADMANABHAN:  Thank you, Your Honor.

4        I want to address a large portion of what Julian --

5   Mr. Julian said, because I think he is attempting to

6   relitigate issues that this Court decided in our last motion

7   to dismiss hearing, dismissing charges of his due process

8   violations and a bunch of other constitutional claims that the

9   Julians made.

10        But one thing I will say, Your Honor, is that the

11  Julians applied for their loan in 2012.  The procedures were

12  not changed after that happened.  The procedure -- the

13  regulations in effect at the time the Julians applied for a

14  loan remained in effect.  It may have changed after they

15  started building their process -- or building their structure.

16  But it cannot be that a structure that was built, for example,

17  in 1900, and they apply for a loan in 2012, that they have to

18  look back to the rules in 1900 to see if their loan would

19  qualify.  At the time they applied for their loan, there were

20  certain procedures in place, and those procedures did not

21  change.  And they were told from the very first denial letter

22  what the requirements were, and those requirements were

23  reiterated over and over to the Julians at the hearing stage,

24  at the administrative appeal, and in front of this Court.  So

25  those rules did not change.

1          In addition, in terms of accusing people in this

2     courtroom of negligence in doing their job, that's not before

3     this Court.  This Court already ruled on that.  The issue is

4     whether Director Klurfeld's determination is arbitrary,

5     capricious, or unsupported by the law.  And we have provided

6     evidence to support Director Klurfeld's decision.

7          And the Julians' assertion that he just must accept

8     what people did, such as Mr. King, what they did, is just not

9     true -- the hearing officer, Mr. King, did is just not true,

10    because Director Klurfeld looked at the two bases for denying

11    the loan.  He only addressed one of them.  He said, "I don't

12    need to reach the second one because I find that he was

13    correct on this one."

14         And Mr. King, the hearing officer, when he issued his

15    decision, he didn't just accept what was done before him,

16    because he said, "I find one of these factors" -- there were

17    three original factors denying the loan.  He found that one of

18    them was not supportable by the evidence, and so he overruled

19    that one, and he affirmed the other two bases for rejecting

20    their loan.  So he didn't simply accept what the agency did on

21    the front line.  He did his own analysis, and Director

22    Klurfeld did the same thing.

23         Thank you, Your Honor.

24         THE COURT:  All right.  We'll give you a decision in

25    writing.

1    Word of caution to you, Mr. Julian, you better be
2  careful about what you post on the Internet.  You may be back
3  before this Court on a contempt charge.  Word to the wise.
4    Let's adjourn court.
5    (Court recessed at 3:34 p.m.)
6
7                        CERTIFICATE
8  I, Judy K. Webb, certify that the foregoing is a
9  correct transcript from the record of proceedings in
10  the above-entitled matter.
11
12  /s/  Judy K. Webb              Date:  10/7/14
13
14
15
16
17
18
19
20
21
22
23
24
25